THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ORIENTAL BANK,

    *Plaintiff*,

v.

MANFED PENTZKE LEMUS, *et al.*,

    *Defendants.*

Civil No. 24-cv-01550 (MAJ)

OPINION AND ORDER

I.    **Introduction**

This case concerns a fraudulent scheme of staggering proportions and the question of who counts as the victims and perpetrators of such scheme. In the face of the economic onslaught of COVID-19, the federal government extended life preservers to small businesses in the form of forgivable loans guaranteed by government funds. A vast network of individuals and entities, including an "inside man" at one of the banks originating these loans, siphoned away several million dollars from the program via a system of fraudulent loan applications and kickbacks. That bank, Plaintiff Oriental Bank ("Oriental"), brings claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and for collection of money against Angel Malaret Belén ("Malaret") and nearly two hundred others who allegedly participated in the scheme (collectively, "Defendants").[1]

On November 29, 2024, Oriental filed this action against Defendants, alleging violations of 18 U.S.C. § 1962(c), 18 U.S.C. § 1962(d), and collection of money under

---

[1]    The vast majority of these Defendants have either been terminated from the case or are in default.

Case No. 24-cv-01550 (MAJ)                                                    Page 2

promissory notes executed by each of the Defendants. (**ECF No. 1**).[2] On June 27, 2025,

Malaret filed the instant Motion to Dismiss. (**ECF No. 431**). Oriental filed a response on

August 25, 2025.[3] (**ECF No. 548**). For the reasons outlined below, the Motion to Dismiss

is **DENIED**.

## II.    Factual Background

### A. The Paycheck Protection Program

In 2020, in response to the ongoing COVID-19 pandemic, Congress enacted the

Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Pub. L. No. 116-136;

134 Stat. 281. The CARES Act created the Paycheck Protection Program ("PPP") to assist

small businesses struggling due to the pandemic with forgivable loans so they could

continue to pay their workers and meet other specified expenses. The CARES Act

allocated funding to the Small Business Administration ("SBA") to fund and guarantee

loans requested by business owners and self-employed individuals. (**ECF No. 1 at 39–

40 ¶¶ 184–185**). The SBA delegated the origination of these loans to certain authorized

financial institutions, including Oriental Bank, who would file completed applications

with the SBA. (**ECF No. 1 at 40 ¶ 186**). The process to receive funds under the program

was as follows:

> To obtain a PPP loan, a qualifying business was required to submit a PPP
> loan application, signed by an authorized representative of the business.
> The PPP loan application required the small business, through its
> authorized representative, to acknowledge the program rules and make
> certain affirmative certifications to be eligible to obtain the PPP loan. In the

---

[2]    On May 6, 2025, Oriental filed its Motion in Compliance with Standing Order for RICO Case Statement (the "Case Statement"). (**ECF No. 340**). Pursuant to the Court's order at ECF No. 247, the Case Statement is treated as an extension of the complaint. *See Miranda v. Ponce Federal Bank*, 948 F.2d 41, 44 n.3 (1st Cir. 1991) (holding that a timely RICO case statement is treated as part of the pleadings when deciding a motion to dismiss) (abrogated on other grounds). The Court therefore refers to both the complaint filed at ECF No. 1 and the Case Statement collectively as the "Complaint."

[3]    Pursuant to the Court's order at ECF No. 472, replies and sur-replies to dispositive motions were not allowed.

> PPP loan application, the small business, through its authorized representative, was required to provide, among other things, its average monthly payroll expenses and number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

(**ECF No. 1 at 5 ¶ 3**). When borrowers were approved for the loan, Oriental would disburse its own money into the borrowers' accounts, backed by the SBA guaranty. Borrowers were restricted by the PPP to spend the proceeds of the loans on specified expenses, including employee payroll, covered mortgage interest payments, rent payments, and utilities expenses. (**ECF No. 1 at 39–40 ¶ 185**). Crucially, the interest and principal on the PPP loans could be entirely forgiven if borrowers spent the proceeds on allowable expenses within a designated period and used a certain percentage of the proceeds towards payroll expenses. (**ECF No. 1 at 6 ¶ 5**).

### B. The Alleged Scheme

The PPP's system of forgivable loans that could be applied for with relative ease garnered the attention of a group of individuals who sought to personally enrich themselves by taking advantage of this lifeline designed to help small business and their employees weather the storm of COVID-19. Plaintiff alleges an enterprise composed of Defendants Major Group, Inc., Social Club LLC, and MGE LLC (collectively, the "Enterprise") that assisted co-defendants in applying for PPP loans by providing guidance and falsified tax forms and supporting documents. (**ECF No. 340 at 380 ¶ 7**). "Such documents were intended to represent to Oriental that such loan applicants earned income as self-employed individuals in amounts ranging from $100,000 to $120,000[,]" thus making them eligible for the loans. (**ECF No. 1 at 41 ¶ 196**).

Defendant Manfred Pentzke Lemus ("Pentzke") was the owner of these three consulting firms and leader of the scheme. (**ECF No. 1 at 67 ¶ 378, 69 ¶ 398**). Pentzke maintained a network of organizers and recruiters who operated the scheme and would refer potential borrowers to the organizers. (**ECF No. 1 at 41–42 ¶¶ 197–199**). These recruiters would contact prospective borrowers, reach an agreement, and solicit personal information to assist in the preparation of false documents. (**ECF No. 1 at 42 ¶ 199**). Recruiters would then refer prospective borrowers to Pentzke, who would submit the loan applications to Oriental via Rodolpho Pagesy Roussel ("Pagesy"), an employee at Oriental tasked with processing PPP loan applications and Pentzke's "inside man." (**ECF No. 1 at 42 ¶¶ 199, 203**). Pagesy would then approve the fraudulent loan applications on behalf of Oriental and assist participating borrowers in creating bank accounts to receive funds. (**ECF No. 1 at 42 ¶ 205**).

After loan applications were approved by Oriental and the SBA, borrowers executed a standard promissory note (the "Promissory Note") that included the terms and conditions of the loans and specified the required uses of the funds. (**ECF No. 1 at 43 ¶ 208**). Specifically, Section 5 of the Promissory Note states that "The Loan will be used by the Borrower exclusively to finance the following commercial or professional activities of the Borrower identified as 'Allowable Uses of Covered Loans' in Section 7(A) of the Small Business Act, as amended by the CARES Act (the 'Eligible Expenses')." (**ECF No. 1 at 43 ¶ 209**). It further warns borrowers that:

> THE BORROWER ACKNOWLEDGES AND ACCEPTS THAT THE BANK HAS WARNED THE BORROWER THAT THE REGULATIONS ADOPTED BY THE SBA ESTABLISHED THAT ONLY SIXTY PERCENT (60%) OF THE AMOUNT OF THE LOAN MAY BE USED FOR OTHER ELEGIBLE EXPENSES THAT ARE NOT PAYMENT OF PAYROLL COSTS. THE BORROWER REPRESENTS, WARRANTS AND AGREES THAT THE

> PROCEEDS OF THE LOAN WILL NOT BE USED FOR ANY PURPOSE OTHER THAN ELIGIBLE EXPENSES, INCLUDING, WITHOUT LIMITATION, CONSUMER OR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES, AND THAT NOT MORE THAN SIXTY PERCENT (60%) OF THE LOAN PROCEEDS DISBURSED BY THE BANK WILL BE USED FOR THE PAYMENT OF ELIGIBLE EXPENSES THAT ARE NOT PAYROLL COSTS.

(**ECF No. 1 at 43 ¶ 209**). Section 8 of the Promissory Note provides for "Events of Default" which allow the PPP loan's maturity to be accelerated by Oriental. (**ECF No. 1 at 43 ¶ 210**). Specified Events of Default included "any representation or warranty made in this Note or any certificate, financial statement, document (including without limitation, the application to obtain this loan or any document required by SBA with respect to it) or verbal communication submitted to Oriental by the Borrower or any guarantor which is proven to be false, deceitful, or intentionally fraudulent," or "if the Borrower or any guarantor fails to comply with any other obligation assumed in relation to this Note, any document or contract executed in connection with this Note (including guarantees, if any)[.]" (**ECF No. 1 at 43–44 ¶ 210**). Section 9 of the Promissory Note states that Oriental may "(a) recover against all the present and future assets of the Borrower and/or any guarantor of the Borrower's obligations; and (b) exercise any other remedy in law or equity, without limitation or restriction of any kind." (**ECF No. 1 at 44 ¶ 211**).

After receiving the loan proceeds from Oriental, borrowers would revert a portion of the proceeds back to the Enterprise as kickback payments and keep the rest. In order to camouflage the scheme and maintain borrowers' eligibility for loan forgiveness, the Enterprise would advise borrowers on how to disguise the unlawful kickbacks as bona fide business expenditures. (**ECF No. 340 at 2**). Participating borrowers would also

request loan forgiveness with guidance from the Enterprise. (**ECF No. 1 at 43 ¶ 207**); (**ECF No. 340 at 217**).

### C. Malaret's Loans

The actions of Malaret, a participating borrower, are particularly relevant to the instant motion. The Complaint alleges that on or around January 2021, Malaret "engaged with the Enterprise to obtain guidance and false documentation to defraud Oriental through the PPP loan application process." (**ECF No. 340 at 15**). On February 4, Malaret executed a Promissory Note for a loan for $18,735.00. (**ECF No. 340 at 15**). On the same day, Malaret executed a Paycheck Protection Borrower Application Form that certified, among other things, that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects." (**ECF No. 340 at 15**). Oriental approved the loan in accordance with applicable SBA regulations, and the proceeds were subsequently deposited into Malaret's account on February 18, 2021, from Oriental's own funds. (**ECF No. 340 at 15**). On February 26, 2021, Malaret issued a $5,638.00 check to Major Group, Inc. (**ECF No. 340 at 15–16**).

In April of 2021, Malaret again engaged with the Enterprise to apply for another loan. On April 29, 2021, Malaret signed another Promissory Note for a $18,735.00 loan and signed the same Paycheck Protection Borrower Application Form. (**ECF No. 340 at 16**). On May 7, 2021, Malaret once again issued a $5,638.00 check to Major Group, Inc. (**ECF No. 340 at 16**).

Both of Malaret's loan applications included falsified 480.6SP and 1040-PR forms as supporting documents. (**ECF No. 1 at 73 ¶ 425**). Oriental alleges that Malaret "knew or should have known that the use of loan proceeds for purposes other than those

expressly authorized by SBA [the kickbacks] was in direct violation of Section 5 of his executed promissory notes, the agency's regulations and federal law," and "that his PPP loan applications were granted as a result of the use of fraudulent information and documents, in violation of Section 8(a) of his executed promissory notes." (**ECF No. 1 at 73−74 ¶¶ 429−430**). Oriental further alleges that Malaret "conspired with Manfred Pentzke Lemus and Rodolpho Pagesy in order to obtain PPP loans for higher amounts as a result of the submission of fraudulent supporting documents, in direct violation of Section 8(a) of his executed promissory notes." (**ECF No. 1 at 74 ¶ 431**). As of May 16, 2024, Malaret's loans are outstanding in the amount of $37,470.00. (**ECF No. 1 at 74 ¶ 432**).

### D. Oriental Discovers the Scheme

After terminating Pagesy's employment for reasons unrelated to the scheme in July of 2021, Oriental detected suspicious supporting documents in various loan files, including 480.6SP forms that appeared to be digitally manipulated and documents that were uncommonly similar across different borrowers' files. (**ECF No. 1 at 40−41 ¶ 191−193**). Oriental alleges that it ultimately identified hundreds of fraudulent acts committed over a thirteen-month period. (**ECF No. 340 at 2**). After discovering Pagesy's actions, Oriental reacted by preserving all evidence of the scheme, putting holds on codefendants' PPP loan accounts, and cooperated with federal authorities in their investigation of the scheme. (**ECF No. 1. at 44 ¶ 215**). Most of the defendants in this case were indicted and subsequently reached plea agreements in connection with the scheme, but Malaret was never indicted for any wrongdoing in connection with his loans. *See* (**ECF No. 340**); (**ECF No. 431 at 4**).

Unfortunately for Oriental, their diligence in reporting the scheme proved the adage that no good deed goes unpunished. It turned out that SBA guaranty does not cover fraudulent loans. After the loans were flagged as fraudulent, the guaranty on the loans was either denied or placed under review. (**ECF No. 340 at 383 ¶ 15**). Because borrowers have not repaid the loans, Oriental has been unable to recoup millions of dollars lent to defendants under fraudulent pretenses. (**ECF No. 340 at 383 ¶ 15**).

### III.    Analysis

### A. Motion to Dismiss for Lack of Standing

Malaret moves under Federal Rule of Civil Procedure 12(b)(1) to dismiss the complaint for lack of subject-matter jurisdiction under the theory that Oriental lacks standing to bring claims against him.[4] (**ECF No. 431 at 5**) In reviewing a motion to dismiss under Rule 12(b)(1) the court "credit[s] the plaintiff's well-pled factual allegations and draw[s] all reasonable inferences in the plaintiff's favor." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010). To establish standing, Plaintiff bears the burden of establishing three core elements: (1) that they suffered an injury in fact; (2) that the injury is traceable to Defendant's conduct; and (3) that the injury is likely to be redressed by a favorable judicial decision. *Santiago-Ramos v. Autoridad de Energía Eléctrica de Puerto Rico, AEE*, 834 F.3d 103, 106 (1st Cir. 2016). Each of these elements will be addressed in turn.

---

[4]    Because the justiciability requirement of standing is viewed as a component of subject matter jurisdiction, the standing challenge is appropriately brought under Rule 12(b)(1). *See Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362–63 (1st Cir. 2001) (stating that justiciability issues should be analyzed under Rule 12(b)(1)).

Case No. 24-cv-01550 (MAJ)                                              Page 9

###### i.    Injury-In-Fact

"To qualify as an injury-in-fact, a complained of harm must be 'concrete and particularized' and 'actual or imminent.'" *Conservation Law Foundation, Inc. v. Academy Express, LLC*, 129 F.4th 78, 87 (1st Cir. 2025) (quoting *Spokeo Inc. v. Robins*, 578 U.S. 330, 338 (2016)). A harm is concrete if it is real and not abstract; it need not be tangible, nor any more than "[a]n identifiable trifle." *Id.* "[W]ith respect to the concrete-harm requirement . . . courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting *Spokeo*, 578 U.S. at 341). "[C]ertain harms readily qualify as concrete injuries under Article III . . . If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *TransUnion*, 594 U.S. at 425. A harm is particularized if it "'affect[s] the plaintiff in a personal and individual way.'" *Conservation Law Foundation*, 129 F.4th at 87 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n. 1 (1992)). The requirement of "actual or imminent" requires that harm be "not conjectural or hypothetical."[5] *Kerin v. Titeflex Corp.*, 770 F.3d 978, 981 (1st Cir. 2014).

Malaret argues that "[t]he Complaint and supplemental RICO Case Statement lack factual allegations showing that Plaintiff Oriental Bank sustained an actual, concrete injury that is both particularized and fairly traceable to any conduct by Mr. Malaret." (**ECF No. 431 at 6**). Specifically, Malaret claims that Plaintiff "fails to allege that it

---

[5]    Malaret does not meaningfully argue that the alleged injury is not actual or imminent. Because the loan balances are outstanding, the Court concludes that the alleged injury is actual, not hypothetical or conjectural. *See Conservation Law Foundation*, 129 F.4th 78, 86 n. 5 (declining to analyze the "actual or imminent" prong where movant did not meaningfully argue it and the result was readily apparent).

incurred any actual financial loss attributable to the PPP loans associated with Mr. Malaret," and that "to the extent that fraud in the loan process may have occurred, the direct injury, if any, would be to the federal government." (**ECF No. 431 at 6–7**). In turn, Oriental argues that the Complaint pleads that Oriental lent its own money to Malaret, that Malaret obtained the loans through fraudulent pretenses and in violation of contract terms, that the SBA's guaranty will not cover Malaret's fraudulent loans, and that those loans are in default and outstanding. (**ECF No. 548 at 7–8**).

Malaret's failure to repay loans in default is sufficient to comprise a concrete harm to Oriental. Malaret argues that the Complaint fails to allege that he "defaulted on repayment obligations . . . or that Plaintiff remains financially responsible for the balance of the loans." (**ECF No. 431 at 6–7**). The Court disagrees with Malaret's reading. The Complaint makes clear that Events of Default occurred under Malaret's promissory notes, that "each of the Defendants' PPP loans is in default," and that Malaret has a total outstanding loan balance with Oriental of $37,470.00 as of April 15, 2025. (**ECF No. 1 at 278 ¶ 1963**); (**ECF No. 340 at 385**). Simply put, the Complaint alleges that Oriental loaned money to Malaret, that the loans became due when it was discovered that Malaret submitted falsified documents with his loan applications, and that Malaret has yet to pay back these loans.

More persuasively, Malaret argues that even if the loans were due, Plaintiff did not "incur[] any actual financial loss attributable to the PPP loans associated with Mr. Malaret" because the Complaint fails to allege that "forgiveness was denied due to his alleged misrepresentations," and does not "state whether the SBA (pursuant to its federal guarantee) reimbursed Plaintiff in full or in part for the disbursed funds." (**ECF No. 431 at 6–7**). Under his understanding, Oriental served as merely a "conduit for the federal

funds" under the CARES Act framework and did not extend capital at its own risk because the SBA served as the ultimate guarantor of the loans. (**ECF No. 431 at 7**). However, the SBA guaranty is a conditional guaranty. According to the Complaint, the guaranty does not apply to loans that are found to be submitted fraudulently. (**ECF No. 340 at 3**). Malaret may be correct that the Complaint does not affirmatively allege that the SBA declined to reimburse Oriental for the disbursed funds or denied forgiveness on Malaret's loans due to the alleged misrepresentations. But this is not fatal to Plaintiff's claims at the pleading stage. Oriental alleges that "[t]he SBA guaranty on these loans has been denied and/or is under review." (**ECF No. 340 at 383**). A necessary corollary of this allegation is that, as of the filing of the RICO Case Statement, the SBA had not paid the guaranty on Malaret's loans. Oriental further alleges that it "disbursed monies it has not been able to recuperate and will not be able to." (**ECF No. 340 at 384**). Drawing all reasonable inferences in the Plaintiff's favor, the Court concludes that Oriental has sufficiently pled that it has suffered a monetary injury that is concrete and particularized.

## ii. Causation

The alleged injury-in-fact must "be 'fairly traceable to the challenged conduct of the defendant.'" *Conservation Law Foundation*, 129 F.4th at 90 (quoting *Spokeo*, 578 U.S. at 338). "[T]he fairly traceable standard requires 'a causal connection between the injury and the conduct complained of.'" *Id.* (quoting *Lujan*, 504 U.S. at 560). With respect to civil RICO claims, proximate cause is also required for statutory standing.[6] *See George*

---

[6]    Constitutional standing does not require a tort-like showing of proximate cause and can be satisfied by "showing that the defendant's conduct is one among multiple causes of the alleged injury." *Id.* (quoting 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3531.5 (3d ed. 2008)). Therefore, proximate cause is not required for standing on the collection of money claim. Because the claims emanate from similar facts, the Court analyzes factual causation and proximate cause together.

*Lussier Enterprises, Inc. v. Suburu of New England, Inc.*, 393 F.3d 36, 51 (1st Cir. 2004) ("Plaintiffs may not succeed by merely proving that the predicate acts were a 'cause in fact' of the plaintiffs' injuries; rather, Section 1964(c) requires that the defendant's specified acts of racketeering were the proximate cause of the plaintiffs' injuries.") (citing *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). In evaluating proximate cause under RICO, the Court should determine whether there is direct relation between the injury asserted and the injurious conduct alleged, as well as "whether the link is too remote between the conduct and the harm suffered." *See In re Neurontin Marketing and Sales Practices Litig.*, 712 F.3d 21, 35 (1st Cir. 2013).

Malaret argues that causation is missing because "Plaintiff has not pled any alleged injury that was the direct result of Mr. Malaret's individual conduct, as opposed to broader systemic factors or alleged misconduct by other parties." (**ECF No. 431 at 7**). Malaret further contends that Oriental's use of "group pleading and collective accusations" fail to establish "individualized harm and direct causation," and that this deficiency is "particularly critical where, as here, the defendant is alleged to have simply applied for and received two PPP loans." (**ECF No. 431 at 7**).

Contrary to Malaret's characterization, the Complaint specifically describes how Malaret engaged in fraudulent activity to the detriment of Oriental. Oriental alleges that Malaret engaged with the Enterprise to obtain guidance and false documentation to defraud Oriental and willingly and knowingly transmitted two loan applications to Oriental containing falsified information. (**ECF No. 340 at 15–16**). Malaret then used part of the proceeds from these loans to give unlawful kickbacks to the Enterprise. (**ECF No. 340 at 15–16**). The use of fraudulent information in the loan applications caused both Malaret's loans to enter default and the SBA guaranty to be inapplicable. (**ECF No.**

**340 at 383 ¶ 15**). Malaret did not subsequently repay his loans. As a result, Malaret had an outstanding balance of $37,470.00 as of April 15, 2025, which forms the basis of the injury for which Oriental seeks relief. (**ECF No. 1 at 74 ¶ 432**). The Court therefore finds that Oriental has alleged an injury that is directly related to Malaret's conduct and that Malaret's conduct is the primary cause of such injury.

### iii.    Redressability

Redressability "requires the plaintiff to demonstrate that the injury would likely be redressed by judicial relief." *Diamond Alternative Energy, LLC v. Environmental Protection Agency*, 606 U.S. 100, 111 (2025). The requirement of redressability "generally serves to ensure that there is a sufficient relationship between the judicial relief requested and the injury suffered." *Id.* at 112. Malaret claims that the redressability element is missing but offers no argument in support of this claim. (**ECF No. 431 at 7**). Nor can the Court discern any possible redressability issue from the pleadings.

Oriental seeks legal damages and equitable relief in the form of disgorgement of illicit gains and an accounting for all illicit benefits, among other forms of equitable relief, because it "sustained (and will continue to sustain) actual, consequential, incidental, and statutory damages to its business and property of approximately $6 million," as a result of Defendants' conduct. (**ECF No. 1 at ¶¶ 1953–56**). The relief sought is intended to redress the alleged injury. *See FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 381 (2024) ("If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury."). The Court therefore concludes that there is a sufficient relationship between the judicial relief requested and the alleged injury suffered.

* * *

Because Oriental has sufficiently alleged that it is suffered an injury-in-fact caused by Malaret's conduct that is likely to be redressed by a favorable judicial decision, the Court concludes that Oriental has standing to pursue its claims and denies Malaret's motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

## B. Motion to Dismiss for Failure to State a Claim

Malaret also moves to dismiss all claims against him under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Under Federal Rule of Civil Procedure 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Federal Rule of Civil Procedure 12(b)(6), in turn, allows a defendant to move to dismiss any complaint which fails "to state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6). When addressing a motion to dismiss under Rule 12(b)(6), courts must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *Gargano v. Liberty Int'l Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009). A complaint need not contain "detailed factual allegations," but must contain enough facts "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A plaintiff's factual allegations must "nudge their claims across the line from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 67 (2009) (citing *Twombly*, 550 U.S. at 570); *see also Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

Because the RICO claims are based on predicate acts of fraud, those claims must comply with the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Puerto Rico Medical Emerg. Grp., Inc. v. Iglesia Episcopal Puertorriqueña*, 118 F. Supp. 3d 447, 456–57 (D.P.R. 2015). Rule 9(b) requires that, [i]n alleging fraud or mistake, a

party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). "To satisfy Rule 9(b)'s particularity requirement, a plaintiff must 'go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communications perpetrating that fraud.'" *Puerto Rico Medical Emerg. Grp.*, 118 F. Supp. 3d at 457 (quoting *Cordero-Hernandez v. Hernandez-Ballesteros*, 449 F.3d 240, 244 (1st Cir. 2006)).

### i.    Claims Under RICO

Oriental alleges violations against all Defendants for violations of RICO under 18 U.S.C. § 1962(c) and RICO conspiracy under § 1962(d). Section 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Section 1962(d) makes it unlawful to conspire to violate § 1962(c). Section 1964(c) creates a "generous private right of action" providing treble damages to successful plaintiffs who are "injured in [their] business or property by reason of a violation of section 1962."[7] *Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 527 (1st Cir. 2015). "Congress has instructed that [RICO] 'shall be liberally construed to effectuate its remedial purposes.' That instruction applies with particular force to the remedial provision of RICO at issue

---

[7]    Because the Court has analyzed this issue as part of the injury and causation prongs of standing, it need not do so again here. Oriental sufficiently alleges that it has been injured in its business and property as a result of the scheme. *See Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 601 (2025). ("A plaintiff has been 'injured in his business or property' if his business or property has been harmed or damaged. Section 1964(c) requires nothing more.").

in this case, 18 U.S.C. § 1964(c)." *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 614 (2025) (quoting § 904 (a), 84 Stat. 947) (Jackson, J., concurring).

### 1. Claim Under Section 1962(c)

To state a civil RICO claim at the pleadings stage, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Lerner v. Colman*, 26 F.4th 71, 77 (1st Cir. 2022). Plaintiff must also allege an injury "by reason of" the violation of Section 1962. *Id.*

### a. Conduct

The "conduct" requirement of Section 1962(c) "requires that a defendant 'conduct or participate, directly or indirectly, in the conduct' of the enterprise." *Puerto Rico Medical Emerg. Grp., Inc.*, 118 F. Supp. 3d at 455 (quoting 18 U.S.C. § 1962(c)). Crucially, the Supreme Court clarified that RICO liability under Section 1962(c) does not extend "beyond those who participate in the *operation or management* of an enterprise through a pattern of racketeering activity." *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993) (emphasis added). "Operation" of the enterprise is engaged in not only by leadership, but also "lower rung participants in the enterprise who are under the direction of upper management." *United States v. Rodríguez-Torres*, 939 F.3d 16, 28 (1st Cir. 2019) (quoting *Reves*, 507 U.S. at 184).

The First Circuit has clarified that the *Reves* "operation or management" test is a relaxed standard. *See United States v. Cianci*, 378 F.3d 71, 95 (1st Cir. 2004). Accordingly:

> The requirement of association with the enterprise is not strict. The RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise. The RICO statute seeks to encompass people who are merely associated with the enterprise. The defendant need only be aware of at least the general existence of the enterprise named in the indictment, and know about its related activities.

*Id.* (quoting *United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002)) (internal quotations removed). At the same time, those "smallest fish" must still be associated with the enterprise; otherwise, the RICO net would risk capturing bycatch whose conduct is untargeted by the powerful statute. *See Reves*, 507 U.S. at 185. The defendant must have "only some part in directing the enterprise's affairs" in order to effect RICO's purpose to "'reach all who participate in the conduct of the enterprise, whether they are generals or foot soldiers.'" *Caro-Bonet v. Lotus Management, LLC*, 195 F. Supp. 3d 428, 431 (D.P.R. 2016) (quoting *United States v. Oreto*, 37 F.3d 739, 751 (1st Cir. 1994)). "Although 'primary responsibility for the enterprise's affairs' is not necessary, having 'some part in directing the enterprise's affairs is required.'" *GM Sectec, Corp. v. Solver4 Global Payment, SL*, Civ. No. 23-1184, 2025 WL 554019, at *29 (D.P.R. Jan. 10, 2025) (quoting *Reves*, 507 U.S. at 179).

Malaret argues that "[n]othing in the Complaint suggests that Mr. Malaret had a decision-making role within the alleged enterprise, shared in any profits, communicated with co-defendants beyond a transactional context, or even understood that his actions were allegedly furthering the objectives of a criminal organization." (**ECF No. 431 at 14–15**). Oriental responds that the Complaint "show[s] Malaret's direct involvement in the scheme, by first submitting falsified documents and information as provided by the Enterprise, and establishing how, afterwards, Malaret provided kickback payments to the Enterprise." (**ECF No. 548 at 13**). They further argue that they "show Malaret knowingly implemented decisions . . . that directly promulgated the Enterprise's purpose." *Id.*

The Complaint alleges that "[o]n or around January of 2021, Malaret [] *engaged with the Enterprise* to obtain guidance and false documentation to defraud Oriental through the PPP loan application process." (**ECF No. 340 at 15**) (emphasis added). One

could read this language as implying that Malaret could not be a part of the Enterprise, since he "engaged with" the Enterprise as an outsider. Under this theory, Malaret was neither a foot soldier nor a general, but merely a customer who purchased guidance and documentation from the organizers of the scheme in exchange for the kickbacks; and as a customer, Malaret played no role in "directing the enterprise's affairs." *Accord Caro-Bonet*, 195 F. Supp. 3d at 431.[8]

But the allegations surrounding Malaret's conduct and the fundamental nature of the alleged enterprise paint a more complex picture. The Complaint alleges a scheme to defraud both the government and Oriental, the success of which relied on the ability of the recruiters to recruit loan applicants. The organizers of the scheme needed to enlist a large volume of willing participants to achieve scale returns. While the organizers of the scheme provided guidance, prepared false documents, and assisted in the loan approval process, it was the participants themselves who made the decisions to submit fraudulent loan applications, submitted false tax documents, disguised illegal kickback payments as legitimate business expenditures, and applied for loan forgiveness. The revenue via kickbacks received by the organizers of the scheme was fully dependent on the willing participation and action by individuals such as Malaret. With this understanding, participants like Malaret were key to the "operation" of the Enterprise. They were not merely customers purchasing the services of an illegal enterprise, but the tip of the Enterprise's spear.[9] Borrowers like Malaret were principal actors who willingly

---

[8]    A plaintiff would be hard pressed to argue, for instance, that street-level purchasers of illegal narcotics for personal use are involved in the operation or management of drug trafficking enterprises.

[9]    Nor does the law require Malaret to be a member of the Enterprise itself; rather, he need only participate in its operation. Indeed, the Enterprise is alleged to be made up of only three corporate entities, and Oriental concedes that "[m]ost defendants are individuals and/or entities separate from the alleged Enterprise." (**ECF No. 340 at 380**).

committed fraud, without whom the Enterprise would have been unable to operate. The Court therefore finds that the Complaint sufficiently alleges that Malaret participated in the "conduct" of the Enterprise.

### b. Enterprise

"Enterprises under RICO include 'any union or group of individuals associated in fact although not a legal entity.'" *United States v. Rodríguez-Torres*, 939 F.3d 16, 24 (1st Cir. 2019) (quoting *United States v. Turkette*, 452 U.S. 576, 578 n.2 (1981)). The alleged enterprise "need not be a legitimate business or a form of organization sanctioned by state law . . . [i]t need only be a group of persons associated together for a common purpose of engaging in a criminal course of conduct." *United States v. Nascimiento*, 491 F.3d 25, 32 (1st Cir. 2007) (internal quotations removed). At the same time, the enterprise must have "existed in some coherent and cohesive form" and "been an ongoing organization operating as a continuous unit." *Id.* It is sufficient to show that the alleged enterprise has "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Caro-Bonet*, 195 F. Supp. 3d at 432 (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)) (internal quotations omitted).

Oriental properly alleges an enterprise comprised of Defendants Major Group, Inc., Social Club LLC, and MGE LLC that operated in conjunction with organizers, recruiters, and borrowers to defraud Oriental and the SBA. (**ECF No. 340 at 380**). Malaret argues that "the Complaint fails to allege any structural features of this purported enterprise—its hierarchy, purpose, decision-making process, or mechanisms for coordinated activity," and that "[m]erely labeling a loose group of defendants as an 'enterprise,' without describing how they collectively pursued a shared purpose through

Case No. 24-cv-01550 (MAJ)                                          Page 20

coordinated conduct," does not meet the requirement of alleging an enterprise. (**ECF No. 431 at 14**).

Contrary to Malaret's arguments, the Complaint details how the constituent entities of the Enterprise collectively worked together to recruit borrowers, assist borrowers with preparing fraudulent loan applications, and advise borrowers on how to disguise kickback payments as legitimate expenditures and obtain forgiveness of the loans. The Complaint makes clear that "the purpose of the Enterprise was to defraud financial institutions such as Oriental through the PPP loan application process," and "provide the semblance of legality through the disbursement/receipt of PPP loan proceeds from other codefendants." (**ECF No. 340 at 377**). The Complaint further identifies that the three entities were all under the direction and control of Pentzke and details the structure of their relationships with organizers, recruiters and borrowers. Finally, it is evident that there was sufficient longevity to permit its associates to achieve its purpose— the Complaint alleges 480 predicate acts over a thirteen-month period. (**ECF No. 340 at 2**).

### c.  Pattern of Racketeering Activity

A "pattern of racketeering activity" is defined by the statute to require "at least two acts of racketeering activity." *Lerner*, 26 F.4th at 77 (quoting 18 U.S.C. § 1961(5)). In turn, "[r]acketeering activity is defined to include a host of so-called predicate acts, including acts that would be indictable as mail or wire fraud." *Douglas v. Hirshon*, 63 F.4th 49, 55 (1st Cir. 2023). In addition to showing two predicate offenses, "the plaintiff must also demonstrate that the 'predicates are related, *and* that they amount to or pose a threat of continued criminal activity.'" *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 15 (1st Cir. 2000) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239

(1989). This first "relatedness" prong may be met by showing that the predicates "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 230 (internal quotations omitted). For the latter "continuity" element, "a plaintiff may demonstrate continuity by proving a series of related predicates extending over a substantial period of time." *Efron*, 223 F.3d at 15 (quoting *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 45 (1st Cir. 1991)). When faced with predicate offenses alleging fraud, the Court determines which predicate offenses meet the Rule 9(b) pleading standard before analyzing whether they meet RICO's "pattern" prong. *See Caro-Bonet*, 195 F. Supp. 3d at 432–33 (citing *Giuliano v. Fulton*, 399 F.3d 381, 389–99 (1st Cir. 2005)).

### i.   Existence of Two Predicate Acts

The Complaint alleges predicate acts of wire fraud, mail fraud, and/or bank fraud consisting of Malaret's (1) wire transmission on February 4, 2021 of a loan application containing falsified tax forms and inflating his income for tax year 2019, (2) issuance of a check in the amount of $5,638.00 to Major Group, Inc. on February 26, 2021 using the proceeds of a PPP loan, (3) wire transmission on April 29, 2021 of a loan application containing falsified tax forms and inflating his income for tax year 2019, and (4) issuance of a check in the amount of $5,638.00 to Major Group, Inc. on May 7, 2021. (**ECF No. 1 at 73–74**); (**ECF No. 340 at 348, 358–59**).

To state a claim for mail or wire fraud, a plaintiff must plead "(1) a scheme to defraud using false pretenses, (2) the defendant's knowing and willing participation in the scheme with the intent to defraud, and (3) the use of the mails or wires in furtherance of that scheme." *Humana Inc. v. Biogen, Inc.*, 126 F.4th 94, 103 (1st Cir. 2025) (internal

quotations omitted). When alleging mail or wire fraud, the plaintiff must satisfy the particularity requirements of Rule 9(b) and "state the time, place and content of the alleged mail and wire communications perpetrating that fraud[.]" *Ahmed v. Rosenblatt*, 118 F.3d 886, 889 (1st Cir. 1997). Courts in this District reject pleadings that make "bald assertions" as to the use of mail and wire communications or fail to specify the mode of communication. *See Caro-Bonet*, 195 F. Supp. 3d at 433 (collecting cases). The federal bank fraud statute creates criminal liability for anyone who "knowingly executes . . . a scheme or artifice . . . (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by . . . a financial institution, by means of false or fraudulent pretenses, representations, or promises[.]" 18 U.S.C. § 1344. Unlike mail and wire fraud, bank fraud does not require specificity with respect to the form of mail or wire transmission by which the fraudulent statement was made. *See Neder v. United States*, 527 U.S. 1, 20–21 (1999). Bank fraud requires that "(1) the defendant knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution; (2) the defendant had the intent to defraud a financial institution; and (3) the bank involved was federally insured." *United States v. Flanders*, 491 F.3d 1197, 1212 (10th Cir. 2007). As to all three forms of alleged fraud, the specificity requirement extends "only to the particulars of the allegedly misleading statement itself, while the other elements of fraud, such as intent and knowledge, may be averred in general terms." *Westernbank Puerto Rico v. Kachkar*, 2008 WL 11357939, at *3 (D.P.R. Sept. 5, 2008) (citing FED. R. CIV. P. 9(b)).

Malaret argues that the Complaint fails to meet the Rule 9(b) threshold as to predicate acts of fraud in three ways: (1) "Plaintiff fails to distinguish Mr. Malaret's conduct from that of the other defendants," (2) "the complaint does not identify any false

statement by Mr. Malaret with sufficient specificity," and (3) "the pleadings omit critical factual context necessary to assess the plausibility of the alleged scheme," including "how the documentation submitted by Mr. Malaret deviated from PPP criteria, what factual inconsistencies or forgeries were allegedly involved, or how Oriental Bank relied on specific representations in disbursing the funds." (**ECF No. 431 at 11–12**).

The Complaint successfully pleads two predicate acts of bank fraud. Oriental alleges that loan applications submitted on February 4 and April 29, 2021, contained 480.6SP and 1040-PR forms that were "falsified and/or prepared using false information." (**ECF No. 1 at 73 ¶ 425**). Specifically, the forms included "inflated income amounts for tax year 2019" and "fraudulent invoices for services supposedly rendered in 2019." (**ECF No. 340 at 367**). Oriental has pled with particularity the content, date, and location of the fraudulent statements. That Malaret's fraud was identical in kind to hundreds of other loan applications does not diminish the particularity with respect to him; indeed, that was the nature of the scheme. Oriental also alleges that it is a federally insured financial institution and thus protected by Section 1344. (**ECF No. 340 at 346**).

With respect to the "knowing" prong, Malaret cites to *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999) for the proposition that "Rule 9(b) requires particular facts giving rise to a 'strong inference' of fraudulent intent." (**ECF No. 431 at 12**). Rule 9(b) requires no such thing. *Greebel* analyzed scienter as required to allege securities fraud under the Private Securities Litigation Reform Act, whereas Rule 9(b) explicitly states that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Greebel*, 194 F.3d at 194–198; FED. R. CIV. P. 9(b). Regardless, the Court finds that Oriental has pled scienter adequately with respect to bank fraud. The Complaint alleges that the Enterprise would first "*inform the borrowers of the scheme* by

instructing them on how to obtain PPP loans, how to qualify for loan forgiveness through fraudulent pretenses, the requisite kickback payments, and how to disguise those unlawful kickback payments as bona fide business expenditures, among other things." (**ECF No. 340 at 2**) (emphasis added). Oriental alleges that "Malaret Belén knew or should have known that his PPP loan applications were granted as a result of the use of fraudulent information and documents[.]" (**ECF No. 1 at 74 ¶ 429**). Taking the above facts as true, the Court agrees. Furthermore, the First Circuit has clarified that Section 1344 applies even when the defendant intended to defraud another party to the transaction but caused injury to the financial institution. *See United States v. Edelkind*, 467 F.3d 791, 797–98 (1st Cir. 2006). The Court therefore finds that Oriental has sufficiently pled two predicate acts of bank fraud.[10]

### ii. Relatedness and Continuing Threat of Criminal Activity

Because the two predicate acts were both committed in furtherance of the alleged broad and far-reaching scheme, the Court also concludes that the predicate acts were "related and implicated a continuing threat of criminal behavior." *See Fiorillo v. Winiker*, 85 F. Supp. 3d 565, 574 (D. Mass. 2015); *Sys. Mgmt., Inc. v. Loiselle*, 303 F.3d 100, 105 (1st Cir. 2002) (noting that a single scheme may be reached by RICO if it is "reasonably broad and far reaching"). Malaret argues that the fact that his alleged misconduct cannot meet the continuity element because "'predicate acts extending over a few weeks or months . . . do not satisfy this requirement.'" (**ECF No. 431 at 16**) (quoting *H.J. Inc.*,

---

[10] Because the Court finds that Oriental has alleged two predicate offenses by Malaret with respect to his loan applications indictable as bank fraud, the Court need not analyze whether the kickback payments constitute predicate offenses or if the loan applications meet the pleading requirement for mail or wire fraud.

492 U.S. at 242). But Malaret's two acts were just two alleged predicates out of over 480 predicate acts alleged against all Defendants that occurred over a thirteen-month period, and Malaret points to no authority suggesting that the continuity element must be pled with respect to each individual defendant. The Court finds that the Complaint sufficiently establishes "one scheme that extends over a period of time" to meet the continuing threat element. *Efron*, 223 F.3d at 16; *see also Fleet Credit Corp. v. Sion*, 893 F.2d 441, 447 (1st Cir. 1990). Oriental has therefore established a pattern of racketeering activity as to Malaret.

At the pleading stage, Oriental successfully alleges that Malaret "participate[d] . . . in the conduct of [an] enterprise's affairs through a pattern of racketeering activity," under § 1962(c).

### 2. RICO Conspiracy Under § 1962(d)

In addition to the claim under § 1962(c), Oriental also makes a RICO conspiracy claim under § 1962(d). To succeed on such a claim, the plaintiff must show that "the defendant knowingly joined the conspiracy, agreeing with one or more coconspirators to 'further [the] endeavor, which, if completed, would satisfy all the elements of a substantive [RICO] offense.'" *See United States v. Rodríguez-Torres*, 939 F.3d 16, 23 (1st Cir. 2019) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)). A plaintiff's "burden in proving a violation of the conspiracy offense, section 1962(d), is to show that the defendant 'knew about and agreed to facilitate' a substantive RICO violation." *United States v. Leoner-Aguirre*, 939 F.3d 310, 316 (1st Cir. 2019) (quoting *Salinas*, 522 U.S. at 66). To state a claim for RICO conspiracy, the plaintiff "must allege 'the same elements of a RICO claim, plus allegations that each RICO co-conspirator knowingly joined the conspiracy[.]" *Duggan*, 596 F. Supp. 3d at 194. Because the Court has already concluded

that Oriental has alleged a violation of § 1962(c) as to Malaret, the Court need only examine whether Malaret "knew about and agreed to facilitate" the RICO violation. *See id.*; *Efron v. UBS Financial Servs. Inc. of Puerto Rico*, 96 F.4th 430, 437 (1st Cir. 2024) (noting that the core elements underlying Section 1962(c) are the same underlying Section 1962(d)).

Neither party offers an argument addressing the standalone elements of RICO conspiracy. But it has already been established that Oriental has adequately pleaded that Malaret knowingly defrauded Oriental through the submission of falsified tax forms on his PPP loan applications. Malaret interacted with the Enterprise through obtaining guidance on how to submit fraudulent loan applications. He further obtained the Enterprise's guidance in disguising payments as approved expenditures under the PPP and remitted kickback payments to Major Group, Inc., one of the Enterprise's constituent entities. Though it is unclear from the Complaint whether Malaret had any knowledge of the scope or scale of the Enterprise and its illegal activities, it is evident that Malaret knowingly joined the conspiracy, at a minimum, with respect to his own fraudulent loan applications. The Court, therefore, finds that Oriental has alleged a RICO conspiracy under Section 1962(d) as to Malaret.

### ii.    Claim for Collection of Money

Oriental alleges an action against all Defendants for "collection of money" of outstanding loans that are in default under the Promissory Notes. (**ECF No. 1 at 277–78**). Collection of money is an action under Puerto Rico law under which a "'plaintiff need only prove that a valid debt exists, that it has not been paid, that the plaintiff is the creditor and the defendants his debtor.'" *Citibank, N.A. v. R2 Advertising, Inc.*, 2013 WL 12234280, at *7 (D.P.R. 2013) (quoting *Gen. Elec. v. Concessionaires, Inc.*, 18 P.R.

Offic. Trans. 38, 52 (1986)). Section 8 of the Promissory Note executed by Malaret on two occasions enumerates as an Event of Default the existence of any document or statement submitted to Oriental by the borrower "which is proven to be false, deceitful, or intentionally fraudulent[.]" (**ECF No. 1 at 277 ¶ 1960**). Section 9 of the Promissory Note states that Oriental may "recover against all the present and future assets of the Borrower and/or any guarantor of the Borrower's obligations[.]" (**ECF No. 1 at 277 ¶ 1962**). Oriental alleges that Malaret submitted false documents to Oriental as part of his loan application, that his loans are in default, and that he has an outstanding balance with Oriental of $37,470.00 as of May 16, 2024. (**ECF No. 1 at 74 ¶¶ 431–432**).

Malaret disputes the validity of the collection claim in only one sentence of his Motion to Dismiss. (**ECF No. 431 at 2–3**) ("Furthermore, the breach of contract and collection claims are deficient as Plaintiff does not allege that Mr. Malaret Belen defaulted on any contractual obligations or misused loan proceeds.") Whether Malaret is intentionally mischaracterizing the Complaint or has simply failed to read it, the Court finds this argument to be unwarranted and disingenuous. *See* FED. R. CIV. P. 11(b)(4). The Complaint states that "each of the Defendants' PPP loans is in default," the precise reason for Malaret's loans entering default, and that Malaret used loan proceeds to pay illegal kickbacks to Major Group, Inc. disguised as legitimate business expenditures. (**ECF No. 1 at 278**). Accordingly, the Court finds that Oriental has stated a claim for collection of money.

Because the Court finds that Malaret has stated claims against Malaret, the Motion to Dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is denied.

### C.  Motion to Dismiss for Failure to Join an Indispensable Party

Finally, Malaret moves under Federal Rule of Civil Procedure 12(b)(7) to dismiss the action for failure to join an indispensable party under Federal Rule of Civil Procedure 19. (**ECF No. 1 at 431**). In reviewing a motion to dismiss under Rule 12(b)(7), the Court "accepts 'all factual allegations in the complaint as true and draws inferences in favor of the non-moving-party.'" *TotalEnergies Marketing Puerto Rico Corp. v. LUMA Energy*, Civ. No. 23-1462, 2024 WL 4729238, at *2 (D.P.R. Nov 8, 2024) (quoting 5C Wright et al., Federal Practice and Procedure § 1359). In doing so, the Court is not limited to the pleadings and may consider "other relevant extra-pleading evidence." *Id.* Moreover, "[i]t is the moving party's burden to show the district court the nature of the absentee's unprotected interests or the prejudice to be suffered by the movant due to the non-joined party's absence." *RVD Realty, Inc. v. Monroe County Sheriff's Office*, Civ. No. 23-1398, 2024 WL 3937238, at *3 (D.P.R. Aug. 26, 2024) (quoting *Corbel Distressed & Special Opportunities Fund, L.P. v. Londoño*, Civ. No. 23-1041, 2023 WL 7390054 at *4 (D.P.R. Nov. 8, 2023)) (internal quotations omitted). Under a 12(b)(7) inquiry, "Courts should keep in mind the policies that underlie Rule 19, including the public interest in preventing multiple and repetitive litigation, the interest of the present parties in obtaining complete and effective relief in a single action, and the interest of absentees in avoiding the possible prejudicial effect of deciding the case without them." *Corbel*, 2023 WL 7390054, at *4 (quoting *Picciotto v. Cont'l. Cas. Co.*, 512 F.3d 9, 15–16 (1st Cir. 2008)) (internal quotations omitted).

Rule 19 considerations involve the balancing of competing interests and must be steeped in 'pragmatic considerations.'" *Piccioto v. Cont'l. Cas. Co.*, 512 F.3d 9, 14 (1st. Cir. 2008) (quoting *Travelers Indem. Co. v. Dingwell*, 884 F.2d 629, 635 (1st Cir. 1989)).

Under the first step of a two-part inquiry, a Rule 19 analysis first examines whether joinder of a party is "necessary." FED. R. CIV. P. 19(a). Then, it provides for dismissal if joinder of said party is not feasible, yet they are "so 'indispensable' that the suit must not be litigated without them." *Piccioto*, 512 F.3d at 15; FED. R. CIV. P. 19(b). Under the "necessary" analysis of Rule 19(a), a party may be deemed necessary if a court finds that it cannot accord complete relief in their absence. FED. R. CIV. P. 19(a)(1)(A). An absent party could also be "necessary" if a district court found either that the litigation would impair or impede the absent party's ability to protect its interests, or if the case would leave the defendant subject to multiple obligations. FED. R. CIV. P. 19(a)(1)(B); *see also Picciotto*, 512 F.3d at 16.

As to the first scenario under Rule 19(a)(1)(A)—whether the Court can afford complete relief among the parties—Malaret objects to the absence of the SBA. (**ECF No. 431 at 17**). Specifically, Malaret appears to argue that this Court cannot accord complete relief among existing parties because the SBA "underwrote and guaranteed the loans at the heart of Plaintiff's allegations" and, thus, the Court cannot "fully and fairly assess whether the loans were fraudulently obtained, misused, or forgiven." (**ECF No. 431 at 17–18**). Ultimately, however, Malaret does little more than recite the statutory language in Rule 19(a)(1)(A); he does not explain why this would make the SBA an indispensable party, as opposed to a mere potential source of discovery. Joining the SBA is not necessary to examine whether Defendant made any misrepresentations in his pursuit of the PPP loans in question or in confirming what he used the funds for. Full relief can therefore be afforded in the absence of SBA.

As to the latter two scenarios under Rule 19(a)(1)(B)—whether this litigation would impair or impede the SBA's ability to protect its interests, or if this case would leave

Malaret subject to multiple obligations—it should be noted that they are predicated on an absent party's *claimed interests. See RVD Realty, Inc.*, 2024 WL 3937238, at *6; *Duggan v. Martorello*, 596 F. Supp. 3d 195, 204 (D. Mass. 2022). Here, Malaret argues that the SBA's "authority, policies, and implementation of the CARES Act" would be necessarily implicated in any determination as to the propriety of the PPP loans or their alleged misuse. (**ECF No. 431 at 17**). He argues that any ruling by this Court would "risk impairing the SBA's interests and could produce inconsistent obligations[.]" (**ECF No. 431 at 17–18**). However, while the SBA's regulatory framework may be relevant, Defendant fails to identify any claimed interests by the SBA or explain why this litigation would yield inconsistent obligations which would make the SBA a *necessary* party in this litigation beyond the possibility that SBA policies may be implicated in the litigation.[11] Broadly speaking, a federal agency is not a *de facto* indispensable party in a private litigation whenever its policies are implicated in a lawsuit. As alluded to by Plaintiff, the SEC is not a necessary party to all private cases of securities fraud that implicate its regulations. Nor does Malaret reasonably argue that failure to join the SBA puts him at risk of incurring double or multiple payment obligations. As detailed in the Complaint, SBA merely provided a conditional guaranty to back a loan issued to Malaret by Oriental; and as the Complaint explains, the SBA was relieved of its conditional obligation to back that loan when the loan was obtained by fraud. It is therefore unclear what claimed interest SBA would possibly assert in this litigation, since the acts of fraud that form the basis of Oriental's claims against Malaret relieved SBA of its conditional obligation to back

---

[11]        "[I]nconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident." *Bacardi Intern. Ltd. v. V. Suarez & Co.*, 719 F.3d 1, 12 (1st Cir. 2013). There is no apparent risk of that happening in this litigation.

Case No. 24-cv-01550 (MAJ)                                                              Page 31

the loans in question. As such, Malaret fails to meet his burden to demonstrate that the SBA is either necessary or indispensable to this litigation.

## IV.    Conclusion

Oriental has standing to pursue claims against Malaret and successfully pleads actions of RICO, RICO conspiracy, and collection of money against Malaret. Furthermore, the SBA is not an indispensable party to this litigation. Accordingly, the instant motion to dismiss is **DENIED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 27th day of March 2026.

*<u>s/ María Antongiorgi-Jordán</u>*
**MARIA ANTONGIORGI-JORDAN**
**UNITED STATES DISTRICT JUDGE**
